JOHN A. WORRALL         )
                                 )
          Petitioner,     )
                                 )
        v.               )      No. 4:09 CV 2079 RWS / DDN
                                 )
DAVE DORMIRE,           )
                                 )
         Respondent.   )

## REPORT AND RECOMMENDATION

This action is before the court upon the petition of Missouri state prisoner John A. Worrall for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) Petitioner also moves for relief from the denial of his motion of the appointment of counsel. (Doc. 15.) The matter was referred to the undersigned United States Magistrate Judge for a report and recommended disposition pursuant to 28 U.S.C. § 636(b)(1). (Doc. 5.) For the reasons set forth below, the undersigned recommends that the petition for a writ of habeas corpus be denied and that the motion for relief from the denial of counsel in these proceedings be denied as moot.

## I. BACKGROUND

On August 26, 2005, a jury in the Circuit Court of St. Louis County found petitioner guilty of one count of voluntary manslaughter, one court of armed criminal action, and one count of possessing more than 35 grams of marijuana. (Doc. 9, Ex. E at 551.) On October 7, 2005, the circuit court sentenced petitioner to concurrent terms of 15 years imprisonment for the voluntary manslaughter, life imprisonment for the armed criminal action, and 5 years imprisonment for drug possession. (Id., Ex. D at 96-98.) On direct appeal, the Missouri Court of Appeals affirmed. (Id., Ex. G); State v. Worrall, 220 S.W.3d 346 (Mo. Ct. App. 2007).

On July 30, 2007, petitioner filed in the circuit court a motion for post-conviction relief under Missouri Supreme Court Rule 29.15. (Doc. 9, Ex. J at 3.) On January 15, 2008, the circuit court denied

petitioner's motion.  (Id., Ex. J at 58-63.)  The Missouri Court of Appeals affirmed the denial of post conviction relief.  (Id., Ex. K); Worrall v. State, 282 S.W.3d 386 (Mo. Ct. App. 2009)(per curiam).

In denying petitioner's direct appeal from his convictions, the Missouri Court of Appeals described the facts, viewed in the light most favorable to the verdicts, thus:

> [Petitioner], a Jamaican who emigrated from London, was charged with first-degree murder, armed criminal action, and possession of over thirty-five grams of marijuana, in connection with the shooting death of his girlfriend, Crystal Hutchison (Victim).
>
> According to [petitioner's] testimony at trial, on July 13, 2002, he was lying on his bed when heard a window break. He did not get up to check on the noise because he figured it was Victim; he heard Victim go into his bathroom, and Victim thereafter appeared in his room with gun. Victim pointed the weapon at [petitioner], hit him with her elbows, demanded money for diapers, and said, "You know I will shoot you." She then went to [petitioner]'s closet to search his clothes for money, laying the gun down in the closet. When she found only fifteen dollars, she told him it was not enough and started hitting [petitioner].
>
> [Petitioner] got up from the bed to stop Victim from hitting him. Victim went to get the gun. [Petitioner] tried to prevent her from getting the gun and the two started fighting for the gun in the closet. Victim dropped the gun. [Petitioner] got on top of Victim and they struggled over the gun. [Petitioner] held on to the gun as they fought over it; after he heard a "pow," he pulled the gun away. When he dropped the gun, he and Victim both stood. When [petitioner] saw Victim come out of the closet and look at the gun, he ran out of the house.
>
> [Petitioner] went to the police station. According to [petitioner], he told the police that he thought only one shot was fired, but they later told him that six shots were fired and that Victim was dead.
>
> Shawn Lane (Lane), an officer with the Jennings Police Department, testified that when [petitioner] arrived at the police station, he was visibly distraught. After determining that someone had been shot, Lane and several other officers proceeded to [petitioner]'s house. When Lane approached [petitioner]'s bedroom, he saw a large amount of blood on the bed's mattress and observed Victim, covered with blood, lying on the floor with a revolver underneath her left arm. Two or

three minutes later, paramedics arrived, and Victim was pronounced dead.

Raj Nanduri, a forensic pathologist, testified that Victim had been shot four times, twice from a distance of at least two feet, and twice at close range. One bullet went through her lower breast and scraped her arm. Another hit her upper arm and fragmented the bone. Another bullet hit Victim in the back of her chest, just under the left arm. Another bullet entered Victim's upper chest on the left side, went through her left lung, tore her pericardium, and hit her right lung before exiting Victim's body; this injury was inflicted with the gun's muzzle pressed against Victim's chest and would have resulted in death within two minutes.

[Petitioner] testified that he was scared of Victim because they had "been through so many problems." When Victim visited him at his house, she would play music loudly, although she knew that [petitioner] did not like loud music. He stated that Victim attacked him on several occasions, breaking out the windows in his house, chasing him with a car, throwing a brick at him, threatening him with a knife, spraying him with an aerosol can, and hitting him with her shoes. Despite these behaviors, [petitioner] loved Victim, and wanted to be with her and their baby. Sometimes, to avoid Victim, [petitioner] would stay away from home or not answer the telephone or door.

One of [petitioner]'s neighbors, Torrey Handy (Handy), testified that he had seen [petitioner] and Victim arguing, but he could not tell what the argument was about or who the aggressor was. Handy believed the couple's relationship was violent.

Stephanie Hall, a friend of [petitioner] and Victim, testified that a few days before the incident, Victim got upset during an argument with [petitioner] because he was ignoring her, and Victim retrieved a knife from the kitchen and attempted to attack [petitioner].

Before trial, [petitioner] endorsed Dr. Thomas Conran as an expert witness and filed notice of his intent to introduce evidence of Battered Spouse Syndrome. The State filed a motion to exclude Dr. Conran's testimony.

During a hearing on the State's motion, Dr. Conran testified that, while [petitioner] did not fit any of the named categories in the Diagnostic and Statistical Manual (DSM IV), [petitioner] did suffer from a mental disease or defect not listed in the DSM IV. Dr. Conran stated that [petitioner] did not suffer from Battered Spouse Syndrome, as originally defined, but that "the facts of the case, would indicate

mutual combat, mutual aggressiveness." In place of the learned helplessness exhibited by battered women, [petitioner] exhibited hyper-defensiveness, which is commonly associated with acts of responsive aggressiveness.

Upon questioning by the court, Dr. Conran opined that [petitioner] suffered "from what would be considered a more male-oriented version [of Battered Spouse Syndrome] that could be clearly and rationally classified as mutual combat." When asked if that version of the battered spouse syndrome was recognized in the psychiatric community, Dr. Conran replied that there was very little consensus as to how to understand men when they were the victims of aggression who also acted out aggressively in their families. He summarized [petitioner]'s situation by stating:

Many women nowadays are much more assertive than they were 20 years ago and I doubt he'd met anyone as assertive in a foreign country as an American woman. He was utterly unprepared, due to his mental problems and the cultural difference, could not handle an assertive young lady, eventually grew defensive, tried to escape from her, hide from her, she pursued him, a gun was brought into the situation, he grew irate over this, defensive, sadly she died and was killed.

The trial court granted the State's motion to exclude Dr. Conran's testimony, specifically finding that Dr. Conran testified that [petitioner] did not suffer from a disease or defect defined in the DSM IV and did not suffer from Battered Spouse Syndrome. During his case in chief, [petitioner] made a narrative offer of proof, stating that Dr. Conran would testify that [petitioner] suffered from a form of Battered Spouse Syndrome called mutual combat. The trial court declined to reverse its ruling excluding Dr. Conran's testimony.

During the instruction conference, the trial court gave [petitioner] the opportunity to object to each of the instructions submitted by the State, and [petitioner] indicated that he had no objections to the offered instructions. When asked if he had any other instructions to tender or any objections to place on record, [petitioner] stated that he had none.

As pertinent to the issues on appeal, the jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. All of these instructions were modified to include the issue of self-defense, as defined in MAI-CR3d 306.06. The jury was also instructed on armed criminal action and possession of a controlled substance.

At the close of trial, the jury returned verdicts finding [petitioner] guilty of voluntary manslaughter, armed criminal action, and possession of more than 35 grams of marijuana.

In his motion for new trial, [petitioner] claimed the trial court erred in excluding Dr. Conran's testimony because Dr. Conran would have testified that [petitioner] "suffered from a mental disease or defect and that the [petitioner] suffered from mutual combat which is a form of Battered Spouse Syndrome."

(Doc. 9, Ex. G at 2-6); <u>State v. Worrall</u>, 220 S.W.3d at 347-49.

## II.  PETITIONER'S GROUNDS FOR FEDERAL HABEAS RELIEF

On December 18, 2009, petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254.  He alleges four grounds of constitutional violations for relief in this habeas action:

(1)  The trial court erred in not allowing him to present evidence that he suffered from battered spouse syndrome.

(2)  His trial counsel was constitutionally ineffective for failing to request a jury instruction on defense-of-premises.

(3)  His trial counsel was constitutionally ineffective for failing to impeach witness Yvonne Goodrich with her prior inconsistent statements about the victim's violent behavior.

(4)  The trial court lacked jurisdiction to try him for armed criminal action because the grand jury failed to return a true bill on that charge and the trial court violated his due process rights because he had no notice of this charge.

(Doc. 1 at 5-11; Doc. 16 at 27-32.)  Respondent contends that these grounds are without merit and that Ground 4 is procedurally defaulted.

## III.  EXHAUSTION AND PROCEDURAL BAR

Congress requires that state prisoners exhaust their state law remedies for the claims they make in federal habeas corpus petitions filed in district court under 28 U.S.C. § 2254.  <u>See</u> 28 U.S.C. § 2254(b)(1)(A).  A state prisoner has not exhausted his remedies "if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  Given the

limitation periods under Missouri law for asserting grounds for relief on direct appeal and in motions for post-conviction relief, no proper procedure for litigating his federal habeas claims remains available to petitioner. <u>See</u> Mo. S. Ct. R. 29.15(b)(post-conviction relief motion must be filed within 90 days after the mandate of the court of appeals affirming the judgment or sentence is filed; if no appeal, within 180 days from the date the person is delivered to the department of corrections); Mo. S. Ct. R. 81.04(a) (10 days to file a notice of appeal after circuit court judgment is final).

However, exhaustion in the sense that petitioner now has no remaining procedure for bringing a claim to the state court does not satisfy the federal statutory requirement. Rather, a petitioner must have fairly presented the substance of each federal ground to the trial and appellate courts. <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (per curiam). If he has not done so and has no remaining procedure for doing so because he has defaulted on the legitimate requirements of the otherwise available procedures, any such ground for federal habeas relief is barred from being considered by the federal courts. <u>Grass v. Reitz</u>, 643 F.3d 579, 584 (8th Cir. 2011); <u>King v. Kemna</u>, 266 F.3d 816, 821 (8th Cir. 2001) (en banc); <u>Sweet v. Delo</u>, 125 F.3d 1144, 1149-50 (8th Cir. 1997) (petitioner's failure to present a claim on appeal from a circuit court ruling raises a procedural bar to pursuing the claim in a habeas action in federal court).

Petitioner did not allege Ground 4 on direct appeal or on appeal from the denial of his motion for post conviction relief to the Missouri Court of Appeals. (Doc. 9, Exs. G and K); <u>State v. Worrall</u>, 220 S.W.3d 346 (Mo. Ct. App. 2007); <u>Worrall v. State</u>, 282 S.W.3d 386 (Mo. Ct. App. 2009). Nor did petitioner raise this claim in his motion for post-conviction relief in the circuit court. (Doc. 9, Ex. J at 3-30, 37-52.)

Nevertheless, petitioner may avoid the procedural bar if he can demonstrate legally sufficient cause for the default and actual prejudice resulting from it, or if he can demonstrate that the federal court's failure by this court to review the claim would result in a fundamental miscarriage of justice. <u>Maples v. Thomas</u>, 132 S. Ct. 912, 922 (2012); <u>Coleman v. Thompson</u>, 501 U.S. 722, 749-50 (1991).

To establish sufficient cause for the procedural default, petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with a state procedural requirement. Maples, 132 S. Ct. at 922; Coleman, 501 U.S. at 750-52.

To establish actual prejudice, petitioner must demonstrate that the alleged errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Ivy v. Caspari, 173 F.3d 1136, 1141 (8th Cir. 1999) (internal citations omitted); see also Charron v. Gammon, 69 F.3d 851, 858 (8th Cir. 1995) (stating that the standard of prejudice to overcome procedural default "is higher than that required to establish ineffective assistance of counsel under Strickland").

To demonstrate that the failure to review his grounds for relief would result in a fundamental miscarriage of justice, petitioner may show that he was actually innocent. Murray v. Carrier, 477 U.S. 478, 495-96 (1986). An assertion of actual innocence must be supported by new, reliable evidence. Schlup v. Delo, 513 U.S. 298, 324 (1995). Without new evidence of innocence, even a meritorious constitutional claim is not sufficient to permit a habeas court to reach the merits of a procedurally defaulted claim. Id. at 316. Schlup requires that a habeas petitioner must "come forward not only with new reliable evidence which was not presented at trial, but [] come forward with new reliable evidence which was not available at trial through the exercise of due diligence." Kidd v. Norman, 651 F.3d 947, 953 (8th Cir. 2011).

Petitioner Worrall alleges that a lack of evidence prevented him from raising federal Ground 4 in the proper forum. (Doc. 1 at 10.) Specifically, he offers as "new" evidence a copy of the indictment against him. (Id. at 70-75.) The indictment is stamped with "Received & Filed . . . October 28, 2009" and includes a certification page. (Id. at 90-93.)

Contrary to petitioner's assertion, this document is not new; it is a copy of the indictment he has had since his case commenced. It was noted in the court minutes and contained in the court's legal file. (Id., Ex. D at 1, 12-14.) It was included in his direct appeal to the Missouri Court of Appeals. (Id., Ex. A at 4 n. 2; Ex. D at 12-13.) That

an extra copy of the indictment was file stamped as of a later date does not change this.  (Doc. 1 at 70.)  Petitioner's argument that no indictment containing the armed criminal action charge was ever filed is gainsaid by the undisputed record of the circuit court.  He could have raised federal Ground 4 in the state courts.

Further, petitioner has not submitted any new and reliable evidence of his actual innocence and he has not otherwise established that the failure to consider Ground 4 would result in a fundamental miscarriage of justice.

Therefore, petitioner's federal Ground 4 claim is procedurally barred from review by this court.  Nevertheless, Congress has authorized this court to consider barred grounds for relief on their merits, if the court concludes that the grounds are without merit.  28 U.S.C. § 2254(b)(2).

As stated above, respondent asserts that none of petitioner's federal grounds for relief have merit.  The undersigned concludes below that Ground 4 is without merit.

## IV.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires that habeas relief may not be granted by a federal court on a claim that has been decided on the merits by a state court unless that adjudication:

   (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to clearly" established law if it "arrives at a conclusion opposite to that reached by [the] Court on a question of law or ... decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Thaler v. Haynes, 130 S. Ct. 1171, 1174 (2010) (per curiam) (citation omitted).  This standard is "difficult to meet" because habeas corpus "is a guard against

extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786 (2011) (citation omitted). A state court's decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Thaler</u>, 130 S. Ct. at 1174.

A state court's factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1); <u>Wood v. Allen</u>, 130 S. Ct. 841, 845 (2010). Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1398 (2011). Clear and convincing evidence that factual findings lack evidentiary support is required to grant habeas relief. 28 U.S.C. § 2254(e)(1); <u>Wood</u>, 130 S. Ct. at 845.

Where a petitioner's claims were not adjudicated on the merits by a state court, such as petitioner Worrall's federal Ground 4, the pre-AEDPA standard for habeas review governs. <u>Gingras v. Weber</u>, 543 F.3d 1001, 1003 (8th Cir. 2008)("Because [petitioner's] apparently unexhausted claim was not adjudicated on the merits, we likely should apply the pre-AEDPA standard of review, rather than the deferential standard of 28 U.S.C. § 2254(d).")(internal citations and quotations omitted); <u>Montes v. Trombley</u>, 599 F.3d 490, 494 (6th Cir. 2010). Under the pre-AEDPA standard, the habeas petitioner must show a "reasonable probability that the error complained of affected the outcome of the trial or that the verdict likely would have been different absent the now-challenged [defect]." <u>Robinson v. Crist</u>, 278 F.3d 862, at 865-66 (8th Cir. 2002)(internal citations omitted).

## V. DISCUSSION

**GROUND 1**

In Ground 1, petitioner claims that the trial court erred in not allowing him to present evidence that he suffered from battered spouse syndrome.

"A state's interpretation of its own law is virtually unreviewable by a federal court." <u>Taylor v. Bowersox</u>, 329 F.3d 963, 968 (8th Cir. 2003). "The admissibility of evidence in a state trial is a matter of state law, and thus [the federal court] will grant habeas relief only if the state court's evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." <u>Palmer v. Clarke</u>, 408 F.3d 423, 436 (8th Cir. 2005). "Only evidentiary errors that are so grossly prejudicial that they fatally infect the entire trial, preventing it from being fundamentally fair, will justify habeas corpus relief." <u>Henderson v. Norris</u>, 118 F.3d 1283, 1286 (8th Cir. 1997).

Missouri law allows the presentation of evidence that an individual is suffering from battered spouse syndrome in determining whether or not an individual acted in self-defense. Mo. Rev. Stat. § 563.033.1. Missouri courts have defined battered spouse syndrome as a serious of cycles that occur in 3 phases: (1) the tension building phase; (2) the explosion or battering incident; and (3) the calm-loving respite. <u>State v. Williams</u>, 787 S.W.2d 308, 311-312 (Mo. Ct. App. 1990). The spouse must remain in the relationship through two cycles of abuse to be classified as a battered spouse. <u>Id.</u> at 311. The victims stay in the abusive relationship because of "learned helplessness," or the victims learn they cannot escape negative events and stop trying to escape when real opportunities present themselves. <u>Id.</u> at 312.

Petitioner wanted to present the defense of battered spouse syndrome at trial through the testimony of Dr. Thomas Conran. (Doc. 9, Ex. E at 43-58.) In a pretrial hearing, Dr. Walker testified that in his expert opinion petitioner had a mental disease or defect, but not one that fit the DSM-IV definition. (<u>Id.</u> at 45.) He described petitioner's situation as "mutual combat," as a way that a man responds to a woman threatening him. (<u>Id.</u> at 46-49.) Dr. Conran described mutual combat as a form of battered spouse syndrome, but not one in the traditional sense. (<u>Id.</u> at 49.) He did not state that petitioner and the victim went through the three phases or two cycles such that petitioner would qualify as a battered spouse. (<u>Id.</u> at 50.) He stated there was no learned helplessness. (<u>Id.</u> at 51.) Dr. Conran ended his testimony stating "if

[petitioner] doesn't have his mental defects and problems, this woman would still be alive today." (Id. at 57.)

At the end of petitioner's defense, petitioner's counsel moved again to admit Dr. Conran's testimony in support of battered spouse syndrome. (Id. at 492-93.) The court excluded the testimony, because Dr. Conran had testified that petitioner did not suffer from battered spouse syndrome, but rather from mutual combat and that mutual combat was not recognized in the psychiatric community. (Id. at 494-95.)

On direct appeal, the Missouri Court of Appeals addressed petitioner's claim that evidence of battered spouse syndrome should have been presented to the jury through Dr. Conran's testimony:

> We conclude that Dr. Conran's testimony offered during the hearing on the State's motion to exclude failed to show that [petitioner]'s condition closely tracked Battered Spouse Syndrome as identified and explained by Dr. Walker. Neither Dr. Conran nor [petitioner] provided testimony indicating the presence of all three phases of the battering cycle, much less evidence that the couple went through the battering cycle at least twice prior to the shooting. The evidence here shows that the shooting took place during a violent encounter precipitated by Victim, not during a lapse between a loving respite and a tension-building phase. Furthermore, the "learned helplessness" element for which testimony is needed to explain why a battered spouse does not leave a violent relationship and why she believes she is forced to kill is absent. The rejected evidence would not assist the jury in understanding [petitioner]'s perceptions of the situation and his conclusion that killing Victim was an act of self-defense.
>
> The trial court's decision was not an abuse of discretion. Point denied.

(Doc. 9, Ex. G at 7); State v. Worrall, 220 S.W.3d 346, 350 (Mo. Ct. App. 2007).

As the Missouri Court of Appeals explained, petitioner did not offer the necessary evidence to establish that he suffered from battered spouse syndrome as defined by Missouri law. Petitioner has not shown that the Missouri courts' evidentiary ruling was contrary to clearly established federal law. Therefore, Ground 1 is without merit.

**GROUNDS 2 and 3**

In Grounds 2 and 3, petitioner claims that his trial counsel was constitutionally ineffective.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court defined ineffective assistance of counsel as arising under the Sixth and Fourteenth Amendments. Under Strickland, a petitioner is entitled to federal habeas corpus relief upon a showing that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.

A petitioner must prove two elements to prevail on a claim of ineffective assistance of counsel. First, a habeas petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. There is a strong presumption that counsel has rendered constitutionally effective assistance. Id. at 690; Blackmon v. White, 825 F.2d 1263, 1265 (8th Cir. 1987). Counsel's strategic choices made after thorough investigation are virtually unchallengeable, and decisions following reasonable, but less thorough, investigation are to be upheld to the extent that they are supported by reasonable judgment. Strickland, 466 U.S. at 690-91.

Second, a habeas petitioner must demonstrate that he was actually prejudiced by counsel's dereliction of duty. Id. at 687. To show prejudice, the habeas petitioner must establish that counsel's professionally deficient performance rendered the outcome of the proceeding unreliable or fundamentally unfair. Id. at 687; Lockhart v. Fretwell, 506 U.S. 364, 369-370 (1993). The prejudice must not be simply a "possibility" but an "actual and substantial disadvantage, infecting [petitioner's] entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

Jury Instruction

In Ground 2, petitioner specifically alleges that trial counsel failed to request an instruction on defense-of-premises. However, petitioner has not satisfied either prong of Strickland.

First, trial counsel's choice not to submit the defense-of-premises instructions did not fall below a reasonable standard of performance.

The jury received a self-defense instruction. (Doc. 9, Ex. E at 497-99.) That is, if the jury believed petitioner was acting in self-defense, it was required to acquit petitioner. (Id.,Ex. D. at 63.) The self-defense instruction required that the jury consider whether petitioner "reasonably believes he is in imminent danger of death or serious physical injury" and that "he reasonably believes the use of deadly force is necessary to protect himself." (Id. at 62-63); see Fisher v. State, 359 S.W.3d 113, 119 (Mo. Ct. App. 2011).

In affirming the denial of post conviction relief, the Missouri Court of Appeals discussed this argument:

> Worrall asserts that counsel was ineffective for failing to request a defense-of-premises instruction. The motion court found no merit to this claim in light of the jury's rejection of Worrall's self defense theory, which counsel undoubtedly viewed as the more compelling of the two. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." [Strickland v. Washington, 466 U.S. 668, at 690 (1984)].

> Here again, Worrall fails to overcome the presumption of competence. And given the jury's rejection of the self defense theory, we are not persuaded that Worrall was prejudiced by counsel's decision not to advance a similar, arguably weaker, alternative theory of defense. We concur with the motion court's conclusion that Worrall's expectation of a better outcome is unfounded. The court's conclusion is not clearly erroneous. We are not left with the definite and firm impression that a mistake was made. Worrall alleges no facts warranting relief, and no prejudice occurred.

(Id., Ex. K Supplemental Memorandum at 4.) Including only a self-defense instruction was a strategic choice and counsel's performance did not fall below an objective standard of reasonableness. See Nave v. Delo, 62 F.3d 1024, 1036 (8th Cir. 1995) (holding that the petitioner's counsel was not deficient for devising a strategy that was unsuccessful or might not have been used by another lawyer).

Second, there was no prejudice by the failure to submit a defense-of-premises jury instruction, and any such failure was harmless, because the result would not have changed if the instruction had been given. "Failure to give a theory of defense instruction is harmless error only where the failure to instruct could not have affected the outcome of the

trial beyond a reasonable doubt." <u>U.S. ex rel. Means v. Solem</u>, 646 F.2d 322, 332 (8th Cir. 1980).

At the time of the alleged offenses, the defense-of-premises instruction required three showings: (1) the victim was trespassing; (2) the victim entered for the purpose of assaulting petitioner; and (3) that force was necessary to prevent the commission of a felony. Mo Rev. Stat. § 563.036. According to petitioner, he was trying to prevent the victim from shooting him. "I couldn't let her get the gun. I tried to stop her from getting the gun." (Doc. 9, Ex. E at 434.)

Assuming petitioner's view of the facts included the facts supporting a defense-of-premises instruction, the jury's verdicts would have been the same. Clearly, because the jury found him guilty after being instructed on his self-defense assertion, it would also have found him guilty if it had been instructed on his premises-defense claim.

Therefore, petitioner has not shown he was prejudiced by his trial counsel's decision not to raise a defense-of-premises defense.

Ground 2 is without merit.


<u>Witness Impeachment</u>

In Ground 3, petitioner alleges that his trial counsel failed to impeach witness Yvonne Goodrich with her prior inconsistent statements to the police about the victim's violent behavior. Petitioner argues that his counsel could have done this by calling Officer Schneider and offering into evidence his police report of Mrs. Goodrich's statements to him.

Petitioner has not shown that trial counsel's decision was objectively unreasonable or that he was prejudiced by counsel's performance in this regard.

Mrs. Goodrich testified at trial on direct examination for the state that she was standing on her front porch, two doors from petitioner's residence, when she saw the victim drive up to petitioner's residence and walk into the it without knocking. Mrs. Goodrich testified that a little while later she saw the victim come out of the residence, go to her car, lean over it like she was getting something out of it, turn and close the car door, and go back inside the front door of the residence. She

testified that she did not see anything in the victim's hands and that it did not appear she had anything hidden under her clothes. (Doc. 9, Ex. E at 241-44.)

On cross-examination by petitioner's defense counsel, Mrs. Goodrich testified that she gave a statement to the police about the victim coming out and returning to the residence. The following colloquy about her prior statement to the police occurred:

> Q    (by defense counsel):    And in that statement she [(the victim)] got something out of her car, but you didn't see what it was and she went back in the house?
>
> A    No, I stated it seems as if she was looking for something in her car, but as I said, when she got out I didn't see anything.
>
> Q    You didn't see what it might have been?
>
> A    Right.
>
> Q    I guess the statement that you made that she seemed as if she got something out of the car, she was moving or acting as if she was doing –
>
> A    Looking.
>
> Q    But you couldn't tell what?
>
> A    Right.
>
> Q    And you weren't really paying that much attention to her at that time, I guess?
>
> A    I noticed her bending over in the car, because my friend was standing on the porch and he said something about her so that's what made me look down.
>
> Q    Now, did you know [the victim] before that day?
>
> A    No, just seeing her come and go.
>
> Q    You've seen her around the neighborhood?
>
> A    No, just there, coming and going there.
>
> Q    Let me ask you about your statement to the police, too. Did you state that sometime in June that you saw her in a car driving in a car chasing Mr. Worrall?

A       No.

Q       You did not say that?

A       No.

Q       I mean, I know this is three years later.

A       Right.

Q       And I just wanted to ask if you had looked at your
        statements or anything before you came to court today?

A       No.

                              *  *  *

A.      No, I didn't say I saw her trying to run him over.

Q       (By [defense counsel]) The officer who took down your
        statement took it incorrectly?

A       Had to.

Q       The officer that took down the statement about the
        broken windows to the house, you didn't say you had
        seen?

A       No.  I didn't say I had seen her busting the windows.
        I said I knew of them being busted.

Q       Had you ever seen any altercations at all between Mr.
        Worrall and [the victim]?

A       No.

(Doc. 9, Ex. E at 248-53.)

        Thus, the records shows that petitioner's counsel questioned Yvonne
Goodrich about her prior statements to the police immediately after the
incident and any inconsistencies between her statements to the police and
her testimony at trial.  Specifically, he asked her about her statements
to the police about whether or not she saw the victim get something from
her car before she went back into petitioner's home; about whether or not
she saw the victim chase petitioner with her car a couple of years before
the victim was killed; about whether or not the victim broke petitioner's
windows; and about any other altercations between petitioner and the
victim.

While petitioner's counsel did not question the police officer who took Mrs. Goodrich's statements or introduce into evidence the police report itself, counsel submitted the same information to the jury through the cross-examination of Mrs. Goodrich.

Petitioner's counsel also introduced evidence of petitioner's and the victim's violent relationship through other testimony. Torrey Handy and Stephanie Hall testified about the violent relationship between petitioner and victim. (Id., at 417-30.) Hall testified she saw the victim pull a knife on the petitioner. (Id. at 422.)

The Missouri Court of Appeals rejected petitioner's argument:

> Lastly, Worrall claims that counsel was ineffective for failing to impeach Yvonne Goodrich, who denied witnessing the victim's violent behavior despite previous contrary statements to police. Failure to impeach a witness does not constitute ineffective assistance unless impeachment would have provided a viable defense or changed the outcome of the trial. The motion court noted that counsel did confront Goodrich with the contradictory police report, and ultimately the court was not persuaded that the absence of further inquiry caused prejudice to Worrall because testimony concerning the victim's violent behavior - Worrall's self-defense theory -- was introduced through other witnesses.

(Id., Ex. K at 4 (internal citation omitted).)

Under the first prong of the Strickland test, petitioner has not shown that his counsel was deficient. Petitioner's counsel impeached Mrs. Goodrich's testimony by questioning her about the inconsistencies between the police report and her testimony. (Doc. 9, Ex. E at 248-53.) He introduced evidence of the violent nature of the relationship between petitioner and the victim. (Id. at 417-30.) His failure to impeach Mrs. Goodrich with Officer Schneider's testimony or his handwritten note was reasonable in light of the other evidence describing the relationship between petitioner and the victim.

Further, under the second prong of the Strickland test, petitioner has not shown that, absent his counsel's failure, the jury would have reached a different verdict.

Thus, Ground 3 is without merit.

**GROUND 4**

In Ground 4, petitioner claims that the trial court lacked jurisdiction to try him for armed criminal action because the grand jury failed to return a true bill on that charge. Construing his petition broadly, petitioner also argues that the trial court violated his due process rights by failing to give him fair notice of that charge. These arguments are without merit, legally and factually.

#### No jurisdiction for lack of an indictment

Under Missouri law, the state's failure to "file an information or indictment formally charging a defendant with a crime is a jurisdictional defect, and there can be no conviction obtained or punishment assessed in a case in which such a jurisdictional defect occurs." Brown v. State, 33 S.W.3d 676, 678 (Mo. Ct. App. 2000).

The record of this action, shows that petitioner was properly charged by indictment with the offenses for which he was convicted. The original complaint, filed in the case on July 14, 2002, charged petitioner with first degree murder and armed criminal action. (Doc. 9, Ex. D at 9-10.) On August 22, 2022, an indictment was filed charging petitioner with first degree murder (Count 1), armed criminal action (Count 2), and possession of a controlled substance (Count 3). (Id. at 11-12.)

Petitioner argues that the purported indictment document was legally ineffective because it lacked a "received" stamp. A stamp indicating "received" is merely evidence that shows a document has been received by the court. State v. Austin, 861 S.W.2d 334, 336 (Mo. Ct. App. 1993). The lack of a stamp does not automatically prove a document was not received by the court. Id. Thus, the Missouri courts had jurisdiction over petitioner under Missouri law because, as is shown in the record, the indictment, which included the armed criminal action charge, was filed with the court. (Doc. 9, Ex. D at 2.)

<u>Due Process</u>

Second, the trial court did not violate petitioner's right to due process by failing to notify him of the charges. In the context of federal habeas relief, a petitioner has the "right to reasonable notice of the charge against him . . . [which] is incorporated in the Fourteenth Amendment to the United States Constitution and thus cannot be abridged by the states." <u>Blair v. Armontrout</u>, 916 F.2d 1310, 1329 (8th Cir. 1990)(quoting <u>Franklin v. White</u>, 803 F.2d 416, 417 (8th Cir. 1986) (per curiam)). "Due process requirements may be satisfied if a defendant receives actual notice of the charges against him, even if the indictment or information is deficient." <u>Hulstine v. Morris</u>, 819 F.2d 861, 864 (8th Cir. 1987).

There was no indication in the record that petitioner was confused by the charges. At no point did petitioner move for a bill of particulars. <u>See</u> <u>State v. Larson</u>, 941 S.W.2d 847, 851 (Mo. Ct. App. 1997) ("A bill of particulars clarifies the charging document."). Petitioner's counsel also could have moved for an extension of time. Neither of these motions were made. Petitioner was also ordered by the court to undergo an examination. (Doc. 9, Ex. D at 16-18.) The order clearly states that petitioner is being charged with Armed Criminal Action. (<u>Id.</u>)

Moreover, at the beginning of trial the pending charges of first degree murder, armed criminal action, and possession of a controlled substance, were stated orally on the record to petitioner three times. (<u>Id.</u>, Ex. E at 63, 65-66.)

| | |
|---|---|
| THE COURT: | We are on the record in open court. All three defense counsel are present. [Petitioner] appears in person and Mr. Dittmeier is also present on behalf of the State. Mr. Dittmeier, you wanted to place on the record the State's recommendation in the event that [petitioner] elected to enter a plea of guilty, and you may do that at this time. |
| MR. DITTMEIER: | Your honor, if [petitioner] was willing to plead guilty to this charge the State offered to amend the charge from Murder First down to Murder Second and recommend a sentence to the Court of 30 years. His sentence - Count 2 |

|                | and 3, the sentences on those to run concurrently with the 30 years on Count 1. |
|----------------|------------------------------------------------------------------------------|
| THE COURT:     | Count 2 is Armed Criminal Action.                                            |
| MR. DITTMEIER: | Yes, Your Honor.                                                             |

(<u>Id.</u> at 63 (emphasis added).)

| THE COURT:       | And is it your desire to go to trial as charged on the offense of Murder First Degree, Armed Criminal Action, and Possession of a Controlled Substance? |
|------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------|
| THE DEFENDANT:   | Yeah.                                                                                                                                                    |

(<u>Id.</u> at 65.)

| THE COURT: | The State of Missouri has charged that [petitioner], John Worrall, has committed the offenses of Murder in the First Degree in that [petitioner], after deliberation, knowingly caused the death of Crystal Hutchinson by shooting her, and <u>Armed Criminal Action</u>, in that [petitioner] knowingly committed the felony of Murder in the First Degree by, with, and through the use, assistance, and aid of a deadly weapon, to wit, a .357 caliber revolver, and Possession of a Controlled substance, a class C felony, in that [petitioner] possessed more than 35 grams of marijuana, a controlled substance, knowing of its presence and nature. |
|------------|---|

(<u>Id.</u> at 66 (emphasis added).)

Thus, the record shows that petitioner was offered a plea agreement and the court clearly stated to petitioner that he was being charged with Armed Criminal Action. (<u>Id.</u>, at 63.) If petitioner did not have time to prepare a proper defense or had not been given notice, he could have stated so, but did not. At the beginning of voir dire, the court again read all three charges against petitioner and no objection or motion was made. (<u>Id.</u> at 66.) Petitioner and his counsel had several opportunities on the record at court to object, seek an extension of time, or to move for clarification of the charges, and repeatedly chose not to. Petitioner had notice of the charges against him and thus due process was

satisfied.  See Franklin v. White, 803 F.2d 416, 417-18 (8th Cir. 1986) (per curiam) (holding that because the defendant had actual notice of charges against him due process was met).

Therefore, petitioner's claims that the Missouri trial court lacked jurisdiction and that the trial court violated his due process rights by failing to give him fair notice are without merit.  The record shows that the grand jury returned an indictment on the armed criminal action charge and that petitioner had fair notice of all charges against him.

Ground 4 is without merit and should be denied.


## VI.  CONCLUSION

For the reasons set forth above,

**IT IS HEREBY RECOMMENDED** that the petition of John A. Worrall for a writ of habeas corpus be denied.

**IT IS HEREBY ORDERED** that petitioner's motion for relief from the denial of appointment of counsel (Doc. 15) is denied as moot.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


    /S/    David D. Noce    
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 17, 2012.